IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-03104-NYW-KAS

ANDUIN LIGHTNER, individually and on behalf of all others similarly situated,

      Plaintiff,

v.

DAVITA, INC.,

      Defendant.

_____

**RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE**
_____

**ENTERED BY MAGISTRATE JUDGE KATHRYN A. STARNELLA**

      This matter is before the Court on Defendant's **Motion to Strike All Consent-To-Join Forms** (the "Motion") [#104]. Plaintiff filed a Response [#113] in opposition to the Motion [#104], and Defendant filed a Reply [#123]. The Motion [#104] has been referred to the undersigned for a recommendation pursuant to 28 U.S.C. § 636(b)(1)(B), Federal Rule of Civil Procedure 72(b)(1), and D.C.COLO.LCivR 72.1(c)(3). *Memorandum* [#106]. The Court has reviewed the briefs, the entire case file, and the applicable law. Based on the following, the Court **RECOMMENDS** the Motion [#104] be **DENIED**. However, the Court also **RECOMMENDS** that, if regular opt-in notice issues in this case, that court-approved corrective notice be issued to the opt-in plaintiffs and that those opt-ins sign and file new court-approved consent forms, which address the deficiencies identified in this Recommendation.

## I.    Background

Plaintiff Anduin Lightner filed this collective action on November 21, 2023, alleging violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201-219, based on Defendant's alleged failure to pay overtime. *Compl.* [#1]. Plaintiff contends that Defendant DaVita, Inc., a nationwide healthcare provider, failed to compensate nurses and technicians for overtime resulting from missed meal breaks. *Id.* Plaintiff alleges that Defendant's practice of requiring nurses and technicians to work through their meal breaks, while also deducting 30 minutes of pay per shift for the meal breaks they did not actually take, deprived those employees of overtime compensation in violation of the FLSA when they worked more than 40 hours per week. *Id.*, ¶¶ 3, 21, 23-30, 33. Plaintiff also alleges that Defendant requires nurses and technicians to clock out for rest breaks during their shifts even when those breaks are shorter than 20 minutes in duration. *Id.*, ¶¶ 22, 33. Accordingly, Plaintiff asserts a single claim, alleging a violation of 29 U.S.C. § 207 for failure to pay overtime wages. *Id.*, ¶¶ 5, 36-44. She asserts this claim on behalf of current and former DaVita nurses and technicians who, from three years prior to the lawsuit's filing to the present, did not receive overtime pay. *Id.*[1]

Six days after initiating this lawsuit, Plaintiff began filing consent forms of individuals who purportedly desire to opt-in to the action. *Consent to Join Forms* [#5-1].

---

[1] Plaintiff's counsel previously brought a collective action against Defendant based on the same alleged practices. *Bowling v. DaVita, Inc.*, No. 21-cv-03033-NYW-KAS. Therein, the District Judge granted "conditional certification, but only with respect to nurses and technicians who worked at DaVita during the relevant time period in . . . nine states: Arkansas; Florida; Georgia; Louisiana; Oklahoma; New York; Tennessee; Texas; and Virginia." *Bowling v. Davita, Inc.*, No. 21-cv-03033-NYW-KLM, 2023 WL 4364140, at *7 (D. Colo. July 6, 2023). On March 3, 2025, Plaintiff filed a motion in this case seeking conditional certification for nurses and technicians in the remaining 41 states. *Am. Motion for FLSA Conditional Certification and Court-Authorized Notice* [#72] at 1 n.1.

To date, Plaintiff has filed 37 consent forms. *Consent to Join Forms* [#1-1, #5-1, #11-1, #12-1, #34-1, #45-1 through #50-1, #52-1 through #58-1].[2] On March 3, 2025, Plaintiff filed an Amended Motion for FLSA Conditional Certification and Court-Authorized Notice. [#72]. Therein, Plaintiff relies on the filed consent forms to support her conditional certification request. *Id.* She also references 28 additional opt-in plaintiffs for whom Plaintiff's counsel has not filed consent forms. *Id.* at 3 (citing Exhibit 25 [#65-25] to original Motion for FLSA Conditional Certification and Court-Authorized Notice [#65]).

During discovery, Defendant deposed several opt-in plaintiffs. *Motion* [#104] at 6[3]. The depositions revealed that Plaintiff obtained their participation through solicitation emails and social media advertisements. *Id.*[4] Defendant contends the advertisements and emails contain false, misleading, vague, and generic information. *Id.* at 12-21. Based on this, Defendant requests the Court strike the filed consent forms and declare void all others in Plaintiff's counsel's possession. *Motion* [#104] at 5.[5] Defendant also seeks to strike the consent forms because they "are legally deficient and misleading" in that "the forms make no mention of whether the opt-ins ever worked for DaVita, let alone the opt-ins' dates of employment and position." *Id.* at 12 (emphasis omitted).

---

[2] Plaintiff since withdrew two of those forms, *Notice of Withdraw of Consent Form* [#41, #51], and Defendant recently filed a Stipulation of Dismissal regarding nine other opt-in plaintiffs. *Stipulation of Dismissal Without Prejudice of Certain Opt-Ins* [#133].

[3] Page number citations refer to the numbering stamped at the top of each page by the Court's docketing system, not to the document's original numbering.

[4] In *Bowling*, the Court denied Plaintiff's request to issue notice via social media. *Bowling,* 2023 WL 4364140, at *9. Here, Plaintiff did so prior to requesting conditional certification and court-authorized notice.

[5] Defendant also requests that a corrective notice issue if regular opt-in notice ultimately issues in this case. *Motion* [#104] at 24; *Reply* [#123] at 13.

## II.    Legal Background

The FLSA sets out required standards governing the payment of minimum and overtime wages to employees. 29 U.S.C. §§ 206, 207. FLSA collective actions may be maintained "only by and among employees who are 'similarly situated.'" *Norwood v. WBS, Inc.*, No. 15-cv-00622-MSK-KMT, 2016 WL 7666525, at *1 (D. Colo. Sept. 29, 2016). The FLSA's collective action mechanism is a two-step process requiring prospective class members to affirmatively opt-in to the litigation. *See Bowling*, 2023 WL 4364140, at *1 (discussing two-step FLSA conditional certification/decertification approach); 29 U.S.C. § 216(b) ("No employee shall be a party plaintiff to any [FLSA] action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought."). Generally, once a court conditionally certifies a collective action, it authorizes a plaintiff to send out notices and opt-in consent forms to potential plaintiffs. *Hoffman-LaRoche Inc. v. Sperling*, 493 U.S. 165, 169-70, 172 (1989); *see also Harris v. Startek USA Inc.*, No. 1:22-cv-00437-RM-SKC, 2023 WL 3976432, at *2 (D. Colo. Mar. 31, 2023) (noting that authorization of notice follows conditional certification).

## III.    Analysis

## A.    Whether Plaintiff's Counsel Used Misleading and False Solicitation Communications

Plaintiff began soliciting potential opt-in plaintiffs via emails and social media advertisements at least as early as mid-October 2023—about one month *before* this lawsuit's filing and about three months after conditional collective certification was granted for nurses and technicians in nine states in *Bowling v. DaVita*, No. 21-cv-03033-NYW-KLM. *Reply* [#123] at 7; *Consent Forms* [#5-1] at 1, 4-5, 7,9 (bearing dates of October 26,

27, 28 and 31, 2023); *see also Solicitation Emails* [#104-4]; *Social Media Advertisements* [#104-9].

"Section 216(b) of the FLSA authorizes trial courts to provide that court-approved notice be sent to potential collective action members to inform them of an action and allow them an opportunity to opt in." *Flores v. J & T Harvesting LLC*, --- F. Supp. 3d ----, 2025 WL 2966105, at *1 (D. Colo. 2025). "Employees must receive 'accurate and timely notice concerning the pendency of the collective action, so that they can make informed decisions about whether to participate.'" *Felps v. Mewbourne Oil Co.*, 460 F. Supp. 3d 1232, 1240 (D.N.M. 2020) (quoting *Aguilar v. Mgmt. & Training Corp.*, No. 16-cv-050-2017 WL 4277139, at *6 (D.N.M. Jan. 27, 2017)). The "notice should describe the nature of FLSA collective action, the FLSA claim and remedies, and offer the recipient the opportunity to opt-in to the action by filing a consent." *Pena v. Home Care of Denver, LLC*, No. 19-cv-00069-CMA-NYW, 2019 WL 5577947, at *2 (D. Colo. Oct. 29, 2019) (internal quotation marks omitted). The notice "should also advise recipients of their right to be represented by counsel for the original plaintiff, to obtain independent representation, or to participate *pro se*." *Id.* "The Court has broad discretion regarding the details of the notice sent to potential opt-in plaintiffs. This discretion requires a court to ensure that the notice is 'fair and accurate.'" *Flores*, 2025 WL 2966105, at *1.

Here, Defendant contends that Plaintiff's pre-certification communications with potential opt-ins contained information that was false or misleading in at least four respects: (1) they misrepresent that the Court in *Bowling v. DaVita* made evidentiary findings concerning meal break violation claims; (2) they inaccurately describe allegations as proven facts; (3) they suggest that DaVita's liability has been established and opt-in

plaintiffs simply need to claim their unpaid wages; and (4) they fail to accurately describe the litigation as one about overtime pay. *See Motion* [#104] at 12-18. Upon review, and for reasons explained below, the Court agrees that the communications contain misleading and arguably false information.

*First*, at least one of the email solicitations states, "[a] federal judge in July 2023 found enough evidence against DaVita to move forward with meal break violation claims on a collective action basis for 9 states where the nurses/technicians worked in that case." *Solicitation Emails* [#104-4] at 7. That statement refers to a July 6, 2023 order issued by the District Judge in *Bowling v. DaVita*, No. 21-cv-03033-NYW-KLM, who is also the District Judge in this case.

That order concerned a motion for conditional certification of a collective of hourly-paid nurses and technicians at DaVita locations in nine states who did not receive overtime pay for weeks in which they worked more than 40 hours because of having time deductions for meal breaks they did not actually take. *Bowling*, 2023 WL 4364140, at *3. At the outset of her analysis, the District Judge expressly noted that that "the Court does not weigh evidence, resolve factual disputes, or reach the merits of the pending claims at the conditional-certification stage." *Id*. The District Judge identified the discrete issue she needed to determine: "whether the [employees] are similarly situated," and she considered workplace policies, deposition testimony, and timesheets. *Id*. at *5-6. Based on that "evidence, coupled with the allegations in the [a]mended [c]omplaint," the District Judge "conclude[d] that [the plaintiff] ha[d] raised substantial *allegations* that the [o]pt-[i]n [p]laintiffs were subject to the same decision, policy, or plan and has met the lenient

conditional-certification standard[.]" *Id*. at *6 (emphasis added). The District Judge did not make any evidentiary findings.

Because the District Judge did not make any evidentiary findings, the solicitation email's assertion that "[a] federal judge in July 2023 found enough evidence against DaVita" is misleading, if not "patently false" as Defendant asserts. *See Motion* [#104] at 13. Moreover, this statement misleadingly implies that a judicial determination of liability has been made, when that is not so.

*Second*, the communications repeatedly assert allegations as proven facts. For example, the communications repeatedly declare that DaVita makes deductions for meal breaks even if the employee was on duty. *Solicitation Email* [#104-4] at 3, 7 (stating, "DaVita is capitalizing on that by making deductions for meal breaks even when you're on duty" and "[m]y investigation revealed that DaVita makes deductions for meal breaks even when healthcare workers remain on duty or skip their breaks entirely"); *Social Media Advertisements* [#104-9] at 2, 3, 5, 9 ("An intense investigation revealed that DaVita makes deductions for meal breaks even when healthcare workers remain on duty or skip their breaks entirely" and "Hospital automatically deducting 30 minutes from shift"). However, DaVita denies that it has a policy to deduct meal break time even if the break was not taken. *See Motion* [#104] at 16 (referring to deposition testimony of Plaintiff and opt-ins who realized that their time records and paystubs do not show deductions); *compare Compl.* [#1] ¶ 2 ("Defendant deducted thirty (30) minutes from the total time worked by nurses and technicians each shift so as to account for these hypothetical meal periods") *with Answer* [#13] (denying allegations concerning time deductions). *Cf. Self v. TPUSA, Inc.*, No. 2:08cv395, 2008 WL 4372928, at *4 (D. Utah Sept. 19, 2008) (ordering

amendment to solicitation website to reflect that the statements "are merely [the] [p]laintiff's contentions rather than established, uncontested facts in the lawsuit."); *Taylor v. CompUSA, Inc.*, No. CIVA1:04CV781-WBH, 2004 WL 1660939, at *3 & n.7 (N.D. Ga. June 29, 2004) (ordering that further pre-notice communications exclude "unqualified, misleading statements," such as "CompUSA management deliberately implemented a corporate wide policy that encouraged or implicitly forced hundreds [of employees] to work thousands of uncompensated hours").

*Third*, the communications strongly suggest, if not blatantly assert, that unlawful pay practices are, in fact, occurring and that back wages are, in fact, owed. Thus, a reader of these communications could reasonably conclude that Defendant is, in fact, liable for violating the law. As examples, the Court points to the following statements in solicitation emails:

- Lead the way in correcting unlawful pay practices and help your fellow workers[.]

- Let's align your compensation with the reality of your job. It's not just fair; it's the law.

- DaVita nurses and technicians are claiming back wages for working through meal breaks without pay and being denied pay for rest breaks.

- You should not feel guilty for asking for fair wages you earned[.]

- [H]elp other nurses as a leader fixing illegal pay practices[.]

- How do you make a claim for backpay?

- We're here to write a new chapter where you're properly compensated for the work you do.

- You've earned it, and claiming it is your right[.]

- Your claim could be the tipping point in reforming industry-wide practices[.]

- Let's get you the compensation that mirrors the reality of your dedication. Fair compensation isn't just nice—it's the law.

*Solicitation Email* [#104-4] at 3, 4, 6-8, 10-12.

And the Court points to the following statements in social media advertisements:

- DaVita nurses and technicians are claiming back wages for working through their meal breaks without pay and being denied pay for rest breaks[.]

- The law firm we've partnered with focuses on helping healthcare workers recover their back pay and wages[.]

- The practice of infringing on workers' meal breaks without paying them amounts to a violation of the Fair Labor Standards Act -- which, in short, means the company is not doing right by us.

- Join Hundreds of Healhcare Workers Who've Reclaimed Their Earned Pay With Our Expertise[.]

*Social Media Advertisements* [#104-9] at 2, 3, 5.

These solicitation messages contain "[l]anguage that courts have found to be problematic in FLSA collective actions"; namely, language that suggests "employees must join the class if they wish to be awarded damages for lost wages." *Self*, 2008 WL 4372928, at *3 (collecting cases). Additionally, these communications are likely to cause a reader to believe incorrectly that Defendant is in fact liable or that a court has found Defendant liable, when the communications are really based on the plaintiff's allegations or theory of the case. *See Vogt v. Tex. Instruments Inc.*, No. 3:05-CV-2244-L, 2006 WL 4660133, at *6 (N.D. Tex. Aug. 8, 2006) (deeming communication misleading because its reference to precedent implied certain victory). These communications "contain factual and legal conclusions that may mislead potential plaintiffs as to their eligibility to participate in the

action and the extent of [DaVita's] potential liability." *Taylor*, 2004 WL 1660939 at *3 & n.7. The communications also mislead the reader to believe that the described wage policies are Defendant's uncontested polices and practices, when, in fact, the described policies are mere allegations, which Defendant has vehemently denied. *See Self*, 2008 WL 4372928, at *4 (ordering modifications to communications that describe employer policies as established, uncontested facts). Further, the communications mislead because they are "overly certain about the prospects and scope of a possible plaintiffs' victory." *Shaw v. Interthinx, Inc.*, No. 13-cv-01229 REB-BNB, 2014 WL 12741157, at *3 (D. Colo. Feb. 7, 2014).

*Fourth*, the communications do not clearly communicate what this case is about: "unpaid overtime wages" for compensable work performed during unpaid meal breaks and compensable rest breaks of less than 20 minutes in duration. *See Compl.* [#1] ¶ 11. Nowhere does the word "overtime" appear in the solicitation emails and social media solicitations. The communications suggest, rather, that the FLSA entitles a nurse or technician to pay irrespective of whether their work through meal breaks resulted in less or more than 40 hours of work in any given week. *See*, *e.g.*, *Solicitation Email* [#104-4] at 3 (intimating an automatic right to recoup backpay for "[wage] deductions for meal breaks even when [the employee is] on duty"). However, skipped meal breaks only constitute FLSA violations if they result in unpaid overtime. *See Berríos-Nieves v. Fines-Nevarez*, Civil No. 18-1164 (JAG), 2019 WL 12043410, at *8 (D.P.R. Feb. 7, 2019) (deeming allegations regarding lack of rest periods and meal breaks inactionable under the FLSA, which "does not require that employers provide employees with rest or meal periods, nor does it require employers to provide paid or unpaid leave."); *see also Sec'y of Labor v.*

*Labbe*, 319 F. App'x 761, 763 (11th Cir. 2008) (noting that a viable FLSA claim concerns "a failure to pay overtime compensation and/or minimum wages to covered employees and/or failure to keep payroll records in accordance with the Act.") (citing 29 U.S.C. §§ 206, 207, and 215(a)(2) and (5)); *Santagata v. MiniLuxe, Inc.*, No. CV 18-428 WES, 2020 WL 2322851, at *1, 3 (D.R.I. May 11, 2020) (dismissing FLSA claim based on "denial of compensation for working through . . . breaks" in absence of any allegation that working through meal breaks without pay resulted in a more than 40-hour workweek) (citing 29 U.S.C. § 207(a)(1)).

In sum, Plaintiff's solicitation communications are misleading and contain arguably false information. The Court declines to set aside its own observations and accord "presumptive weight" to the Texas State Bar's "advertisement approval," as Defendant requests. *See Response* [#113] at 14. The Court more directly addresses the Texas State Bar's approvals in Section III(D), below.

**B.    Whether Language on Consent Forms is also Misleading**

Defendant also seeks to strike the consent forms because they "are legally deficient and misleading" in that "the forms make no mention of whether the opt-ins ever worked for DaVita, let alone the opt-ins' dates of employment and position." *Motion* [#104] at 12 (emphasis omitted). In response, Plaintiff argues that the consent forms "remain valid" even if they do not include certain identifying information. *Response* [#113] at 4. In support, Plaintiff presents two arguments. First, the FLSA only requires a prospective party plaintiff to give "consent in writing" and ensure that "consent is filed in the court[.]" *Id.* (citing 29 U.S.C. § 216(b). Second, Plaintiff argues that discovery has enabled Defendant to determine whether the opt-in plaintiffs are similarly situated. *See id.* (noting

that Phase I discovery enabled a "deep dive" that "resulted in clear identification of the Opt-In Plaintiffs' job titles, work locations, date of employment and positions[.]"). In reply, Defendant maintains that individuals who do not qualify opted in because of the "legally-insufficient consent forms." *Reply* [#123] at 10. As an example, Defendant points to a filed consent form that mentions claims for minimum wage violations and state law claims. *Id.* at 10 (citing *Consent Form* [#45-1]). Additionally, Defendant asserts that discovery's deep dive revealed that nine opt-ins are ineligible to join the case: Seven are time-barred and two never worked for Defendant. *Id.* at 11.

The Court's review of the filed consent forms reveals the following: They do not identify the case name, jurisdiction, or the corporate defendant; they do not identify what position the opt-in plaintiff worked or when; they inappropriately apply to "any action or proceeding that may be filed on [the opt-in plaintiff's] behalf for such recovery"; they require agreement "to be the named plaintiff and/or one of the named plaintiffs and a representative of the class/collective action members in this case"; and they require agreement to representation "by the Wage and Hour Firm, and any other attorneys or law firms with which they choose to associate," without any indication that the claimants were notified that they may choose their own counsel or proceed *pro se*. *See*, *e.g.*, *Consent Forms* [#5-1], [#11-1], [#12-1], [#34-1]. Other consent forms contain the same issues but also identify the lawsuit as brought "under the Fair Labor Standards Act and *all applicable state laws*"—even though this lawsuit has no state law claims. *See*, *e.g.*, *Consent Forms* [#45-1], [#46-1], [#52-1], [#55-1].

While Defendant attacks the consent forms' legal sufficiency and asks the Court to strike them, Defendant cites no authority to support that position. And, based on the

Court's own research, courts opt for a more tailored approach. For example, in *Threatt v. Residential CRF, Inc.*, No. 1:05-CV-117, 2005 WL 2454164, at *3-4 (N.D. Ind. Oct. 4, 2005), the court considered consent forms that "blatantly overstate[d] the conditionally certified class" by including employees outside the operative time period, employees of a dismissed corporate entity, and all employees of the remaining corporate defendants, not just employees at a specific, relevant subset of employees. Because the consent forms overstated the class, the court suspected that "many of the individuals with consent forms on the record may not be similarly situated to the [p]laintiffs and may not fall within the class conditionally certified[.]" *Id.* at *4.

Nevertheless, the court declined to strike the consent forms and opted for a carefully tailored approach: It ordered the plaintiffs to timely file amended, court-approved consent forms for each opt-in plaintiff who has a filed consent form. *Id.* The court would then deem each amended consent form to relate back to the original consent form's filing date and the amended form would "confirm to the [c]ourt that such opt-in plaintiff falls within the description of the conditionally certified class." *Id.* This approach, the court reasoned, would avoid the "equitable tolling dilemma with respect to the statute of limitations" that would likely arise if the court were to strike the filed consent forms. *Id.* at *3-4.

In *Reyes v. Topgolf International, Inc.*, No. 3:17-CV-0883-L, 2017 WL 11496868, at *7 (N.D. Tex. May 15, 2017), the court determined that pre-certification consent forms were misleading because they "fail[e]d to inform potential opt-in plaintiffs as to their right to contact other counsel and . . . fail[ed] to disclose the effects of consenting to serve as a class representative." As a remedy, it declined to strike the consent forms. The court

instead ordered the plaintiff to "contact each potential claimant who has executed the original consent form . . . and provide a curative notice and consent form that amends all of the misleading aspects" the court had identified. *Id*. at *9.

Like the consent forms in *Threatt* and *Reyes*, the consent forms in this case contain deficiencies and are misleading. Also, like the courts in *Threatt* and *Reyes*, this Court recommends denying the request to strike the consent forms and opting instead for a carefully tailored approach.

**C.     Identifying the Appropriate Remedy for Misleading Communications**

Having determined that the solicitation communications are misleading and that the consent forms are deficient and misleading, the Court next considers the appropriate remedy.

Defendant asks the Court to strike and declare as void "all consent forms Plaintiff's [attorneys] have obtained to date" and to "not consider them in deciding Plaintiff's conditional certification motion." *Motion* [#104] at 24. Additionally, Defendant states that corrective notice should issue "if regular opt-in notice ultimately issues in this case." *Id*.

In response, Plaintiff argues that "attorney advertising is protected by the First Amendment to the United States Constitution, subject only to narrowly tailored restrictions related to truthfulness and other important state interest." *Response* [#113] at 2. Plaintiff further argues that the Court may not restrict Plaintiff's counsel's First Amendment rights because the Texas State Bar approved the advertisements and that "approval carries presumptive weight" as to truthfulness and non-deception. *Id*. at 11, 14-15. Plaintiff explains that the Texas State Bar's Advertising Review Committee reviews all ads "with an eye toward whether an ad is 'false or misleading,'" and the Committee did not simply

rubber stamp Plaintiff's ads. *Id*. at 14. In essence, Plaintiff contends that the Texas State

Bar's imprimatur moots the question of truthfulness and non-deception and, therefore,

the Court should leave the consent forms alone. The Court disagrees.

Here, the consent forms are a form of commercial speech because they are

"expression[s] related solely to the economic interests of the speaker and its audience."

*Vogt*, 2006 WL 4660133, at *4 (deeming precertification solicitation communications

commercial speech) (quoting *Cent. Hudson Gas & Elec. Corp. v. Pub Serv. Comm'n of

N.Y.*, 447 U.S. 557, 561 (1980)) (internal quotation marks omitted). Commercial speech

receives less constitutional protection than other forms of speech. *Id*. (*citing Cent. Hudson

Gas.*, 447 U.S. at 563). Nevertheless, limitations on pre-opt-in communications with a §

216(b) potential plaintiff are not imposed "unless the communication undermines or

contradicts the Court's notice, or is misleading, coercive, or otherwise improper." *Stransky

v. HealthONE of Denver, Inc.*, 929 F. Supp. 2d 1100, 1105-06 (D. Colo. 2013) (internal

quotation marks and citation omitted).

"[A]n order limiting communications between parties and potential class members

should be based on a clear record and specific findings that reflect a weighing of the need

for a limitation and the potential interference with the rights of the parties." *Gulf Oil Co. v.

Bernard*, 452 U.S. 89, 101 (1981) (quoted in *Self*, 2008 WL 4372928, at *2)). Additionally,

a court should "identify[] the potential abuses being addressed" and carefully craft the

order to "limit[] speech as little as possible, consistent with the rights of the parties under

the circumstances." *Id*. An order will generally "satisfy [F]irst [A]mendment concerns if it

is grounded in good cause and issued with a heightened sensitivity for [F]irst

[A]mendment concerns." *Self*, 2008 WL 4372928, at *2 (quoting *Kleiner v. First Nat'l Bank*, 751 F.2d 1193, 1205 (11th Cir. 1985)).

Even where pre-notice communications contain unreliable and possibly misleading information, courts have declined to strike consent notices resulting from those communications where a defendant has "failed to present any evidence that the consenting plaintiffs were, in fact, misled." *Shaw*, 2014 WL 12741157, at *3 (declining to strike consent form where the recipient of a potentially misleading communication was not misled) (citing *Gerlach v. Wells Fargo & Co.*, No. C 05-0585 CW, 2006 WL 824652, at *6-7 (N.D. Cal. Mar. 28, 2006) (declining to order a corrective notice for a communication that was "not sufficiently misleading or coercive" where no potential collective action members who had received the communication were deposed to determine whether they were misled)); *but see Sandoval v. Serco, Inc.*, No. 4:18-CV-01562, 2019 WL 2075910, at *7 (E.D. Mo. May 10, 2019) (striking all filed consent forms—without any discussion of First Amendment considerations—and requiring use of a curative, court-approved notice).

Courts have also declined to prohibit admission of evidence from opt-in plaintiffs who relied on misrepresentations in solicitation communications. *See*, *e.g.*, *Self*, 2008 WL 4372928. In *Self*, the court declined to strike consent forms or prohibit admission of evidence from certain opt-ins even though solicitation communications presented allegations about the defendant's policies and the lawfulness of the defendant's conduct as uncontested and intimated that the reader had a definitive claim in a particular factual scenario. 2008 WL 4372928 at *3-4. The court deemed such an action as "too extreme."

*Id*. at *5. Instead, the court ordered the plaintiffs to issue a curative notice and to require the opt-ins to complete new consent forms. *Id*.

Here, the Court agrees that striking the consent forms is too extreme. This is especially true because Defendant has failed to present evidence that the opt-ins in this case were, in fact, misled by the solicitation communications. Though Defendant intimates that the solicitation communications caused confusion, *see Motion* [#104] at 15-16, the document Defendant cites does not clearly make that connection. In particular, Plaintiff, three nurse opt-ins, and two technician opt-ins believed Defendant was deducting 30-minutes per shift from their time entries but realized—during their depositions—that no time deductions occurred. *See Def.'s Response to Pl.'s Opposed Motion for FLSA Conditional Certification* [#73] at 5. However, Defendant concedes that "the Court cannot determine the extent to which each opt-in was influenced by misleading communications[.]" *Motion* [#104] at 21. Further, at least one opt-in believed automatic deductions occurred "because two FAs said they were [occurring]"—not because of solicitation communications. *See Def.'s Response to Pl.'s Opposed Motion for FLSA Conditional Certification* [#73] at 5.

The Court instead **recommends** that Plaintiff be required to (a) use an amended, court-approved consent form, (b) contact each potential claimant who has executed the original consent form and provide a curative, court-approved notice and consent form, and (c) have all potential claimants execute the court-approved notice and consent form. *See Reyes*, 2017 WL 11496868, at *9.

**D.      Plaintiff's Counsel's Lack of Candor with the Court**

Finally, the Court takes a moment to address Plaintiff's counsel's lack of candor with the Court by way of statements that, like the solicitation communications and consent forms, are misleading, if not patently false.

First, the Court addresses a statement by Plaintiff's counsel, Gavin B. Kennedy, that he is "admitted to practice in Colorado like the other attorneys here." *Apr. 21, 2025 Hr'g Tr.* [#82] at 9:24-25. A search of the attorney database of the Colorado Supreme Court's Office of Attorney Regulation Counsel reveals that Mr. Kennedy *is not* admitted to the Colorado bar, though he is admitted to the bar of the U.S. District Court for the District of Colorado. This is corroborated by a visit to Mr. Kennedy's law firm's website, where "Texas" and "U.S. District Court District of Colorado"—but not "Colorado"—are listed among his bar admissions. *See https://kennedyattorney.com/about-us/* (last visited Jan. 18, 2026).

Likewise, Attorney Ricardo J. Prieto, an attorney for Plaintiff who also appeared at the April 21, 2025 discovery hearing with Mr. Kennedy is *not* admitted to the Colorado bar, as revealed by a search of the Office of Attorney Regulation Counsel's attorney database. This is corroborated by a visit to Mr. Prieto's law firm's website, where "Texas State Bar" and "United States Colorado District Court"—but not "Colorado"—are listed among his bar admissions. *See https://wageandhourfirm.com/about-us/* (last visited Jan. 18, 2026).

Through D.C.COLO.LAttyR 2(a), this District has adopted the Colorado Rules of Professional Conduct as the standards for professional responsibility. Rule 3.3 of the Colorado Rules of Professional Conduct requires candor toward the tribunal. In relevant part, Rule 3.3 prohibits a lawyer from knowingly "mak[ing] a false statement of material

fact . . . or fail to correct a false statement of material fact[.]" COLO. R. PRO. CONDUCT 3.3(a)(1). Comment 3 to that rule states, "an assertion purporting to be on the lawyer's own knowledge, as in . . . a statement in open court, may properly be made only when the lawyer knows the assertion is true or believes it to be true on the basis of a reasonably diligent inquiry."

Here, Mr. Kennedy obviously knew in what jurisdictions he was admitted to practice law when he affirmatively stated that he is "admitted to practice in Colorado." Giving Mr. Kennedy the benefit of the doubt, the Court presumes that Mr. Kennedy meant to say that he was admitted to practice in the U.S. District Court for the District of Colorado. However, this sloppiness is practically misleading.

Next, the Court addresses Mr. Kennedy's arguments regarding the Texas State Bar's approval of his team's solicitation communications.[6] Here, the statements to the Court are beyond sloppy. They are misleading—akin to the previously discussed solicitation emails and social media advertisements. At the April 21, 2025 discovery hearing, Mr. Kennedy explained that the Texas State Bar's Ethics Advertising Review Committee reviewed every communication Plaintiff's counsel disseminated "with a fine-tooth comb[.]" *Apr. 21, 2025 Hr'g Tr.* [#82] at 10:3-7. Mr. Kennedy represented that the Committee looked at whether the communications contained misleading statements of fact or law or any type of coercion or made an unreasonable promise or expectation that a particular result was guaranteed or likely. *Id.* at 10:8-12. Mr. Kennedy further

_____

[6] Notably, Plaintiff's application to the Texas State Bar for advertisement approval was limited to her email communications. *Reply* [#123] at 5 (citing *Attorney Application for Texas Bar Approval* [#105-1]).

represented that he "submitted [the solicitation communications] to [Texas] state bar [and] they approved it[.]" *Id*. at 10:16-17.

However, materials from the Texas State Bar's review reveals that it scrutinized statements about the firm's qualifications, credentials, and experience—not statements about Defendant's wage policies, whether Defendant violates the law, and whether potential plaintiffs are automatically entitled to recoupment of back wages. Moreover, a news article included in the submitted materials was not even about Defendant Davita; rather, it was about a Dallas hospital's purported lunch pay policies. *See Notice of Filing* [#105-1] at 34 (*Dallas Morning News* article). On November 1, 2023, the Committee noted that the submitted solicitation communications made "Unsubstantiated Claims and Comparison" regarding the firm's qualifications or services and set unjustified expectations. *Notice of Filing* [#105-1] at 37. Accordingly, the Committee asked for additional information. *Id*. The Committee then highlighted the following assertions it seemed problematic:

- "Over 2,000 healthcare workers have hired my firm to represent them[.]"

For this statement, the Committee asked for "objective, [substantiating] documentation". *Id*. at 38.

- Badges for "Houston's Top Lawyers" and "The National Trial Lawyers Top 100 Trial Lawyers".

In connection with those badges, the Committee asked for the specific years when those recognitions were received. *Id*. at 38.

On November 13, 2023, presumably after Plaintiff's counsel provided the requested substantiation, the Committee approved the solicitation emails. *See Notice of*

*Approval* [#105-1] at 64-65; *see also Notice of Approval* [#89-1]. The Notice of Approval further reveals that the Committee's review was limited to "compliance with Part VII of the TDRPC [Texas Disciplinary Rules of Professional Conduct] regulating lawyer advertising"; it did not include "ethics issues that may be present[.]" *Notice of Approval* [#89-1] at 2. Additionally, the Committee "reserve[d] the right to request substantiation of claims made in the advertisement" and to "rescind approval" if "it is discovered that the communication contains or implies false and otherwise misleading information[.]" *Id*. The Notice of Approval contains no indication that the Committee ever requested substantiation of the Davita-specific claims or insinuations made in the advertisement. Therefore, Mr. Kennedy's representation that the Committee reviewed the advertisements with a "fine-tooth comb" is inaccurate and misleading and violates that Standards of Professional Conduct, D.C.COLO.LAttyR 2, and Colorado Rule of Professional Conduct 3.3.

The Court takes this conduct seriously. Such conduct undermines the integrity of these proceedings and requires greater expenditure of resources by the Court and by the responding attorney. One can zealously advocate for a client without fudging or misstating the facts or making outright misrepresentations to the Court. Counsel is warned that any further misrepresentations will likely result in sanctions, referral to the Committee on Conduct, or both.

## IV.    Conclusion

For the reasons stated above,

IT IS HEREBY **RECOMMENDED** that the Motion [#104] be **DENIED.**

IT IS FURTHER **RECOMMENDED** that, if regular opt-in notice issues in this case, a court-approved curative notice be issued to each opt-in plaintiff who has signed a

consent form and that each opt-in sign and file an amended consent form, on a court-approved form.

IT IS FURTHER **ORDERED** that pursuant to Federal Rule of Civil Procedure 72, the parties shall have fourteen (14) days after service of this Recommendation to serve and file any written objections to obtain reconsideration by the District Judge to whom this case is assigned. A party's failure to serve and file specific, written objections waives de novo review of the Recommendation by the District Judge, Federal Rule of Civil Procedure 72(b); *Thomas v. Arn*, 474 U.S. 140, 147-48 (1985), and also waives appellate review of both factual and legal questions, *Makin v. Colo. Dep't of Corr.*, 183 F.3d 1205, 1210 (10th Cir. 1999); *Talley v. Hesse*, 91 F.3d 1411, 1412-13 (10th Cir. 1996). A party's objections to this Recommendation must be both timely and specific to preserve an issue for de novo review by the District Court or for appellate review. *United States v. One Parcel of Real Prop.*, 73 F.3d 1057, 1060 (10th Cir.1996).

Dated: January 18, 2026                    BY THE COURT:

Kathryn A. Starnella
United States Magistrate Judge